IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,467






MANUEL GARZA, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


CAUSE NO. 2001-CR-1877 FROM THE 399TH DISTRICT COURT

BEXAR COUNTY





 Keasler, J., delivered the opinion of the Court in which Keller, P.J., and Price,
Womack, Johnson, Hervey, Holcomb, and Cochran, JJ., joined. Meyers, J., did not
participate. 


O P I N I O N



 Manuel Garza was convicted in October 2002 of capital murder. (1) Pursuant to the
jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article
37.071, Sections 2(b) and 2(e), (2) the trial court sentenced Garza to death. (3) Direct appeal to
this Court is automatic. (4) Garza raises six points of error challenging his conviction and
sentence. We reject each of his contentions and affirm the trial court's judgment and
sentence.

 In his first point of error, Garza argues that the trial court erred in granting trial
counsel's motion to withdraw. The trial court has discretion to determine whether counsel
should be allowed to withdraw from a case. (5) 

 On February 21, 2001, the trial court appointed Raymund E. Fuchs to serve as Garza's
first-chair counsel and Edward Camara, Jr., to serve as Garza's second-chair counsel. Garza
was indicted for capital murder on April 11, 2001. On July 11, 2002, Fuchs filed a motion
to withdraw as counsel, and the trial court judge granted the motion on the same day. The
trial court appointed Vincent D. Callahan to represent Garza on July 19, 2002. The trial was
scheduled to begin on August 30, 2002. 

 On July 24, 2202, Camara objected that the trial court had removed and replaced
Fuchs without Camara's knowledge and had refused Camara's request to postpone the trial. 
The trial court held a hearing to address Camara's objections on August 5, 2002. At the
hearing, Fuchs explained that he had requested the trial court's permission to withdraw
because he was going to be out of the country for a month and the trial court had been
unwilling to change the date of the trial to accommodate his schedule. The trial judge
explained that she had granted Fuchs permission to withdraw "in what [she] believed was
enough time for another attorney to come on the case, get on board with everything that
needed to be done, and still have the case heard when it had been scheduled." 

 Camara stated that Garza felt "discouraged," "depressed," and "abandoned" because
Fuchs had withdrawn after Garza had "developed some sort of confidence and relationship"
with him. When the trial court asked Garza to describe the relationship that he had
established with Fuchs, Garza replied: "Basically, I - - I know of his - - his good works and
I had confidence in him and, you know, he seemed like a nice guy that was willing to fight
for me." Camara also stated at the hearing that he was unprepared for trial because he had
not become aware of the trial setting and the fact that Fuchs had withdrawn until mid-July. 
The trial court pointed out that several motions had been filed since Callahan had been
appointed, including motions for "an appointment for a DNA expert, pathology expert, a
GSR expert, some supplemental motions for discovery in addition to a motion for an
independent psychological exam." Callahan added that the mental health expert "would be
completely finished with his work by the time the court has presently scheduled the trial." 
On this record, we cannot conclude that the trial court clearly abused its discretion in
permitting Fuchs to withdraw from Garza's case.

 Garza also alleges that the trial court failed to comply with Article 26.04 because she
permitted Fuchs to withdraw without entering a finding of "good cause" on the record. (6) 
However, the version of Article 26.04 in effect at the time Garza committed the offense did
not contain the "good cause" provision. The current version of that statute applies only to
offenses committed after January 1, 2002. (7) In addition, there is no "good cause" requirement
in Article 26.052, which governs the appointment of counsel in death penalty cases. Point
of error one is overruled. 

 In point of error two, Garza argues that the trial court erroneously excluded testimony
from witness Erica Henderson about whether she believed that the murder was intentional
or accidental. Garza was charged with the murder of police officer John Riojas, and the State
called Henderson to testify that she witnessed the incident. Henderson testified at trial that
she observed a police officer struggling with a man he was trying to apprehend. She testified
that she observed the man with a gun in his hand, heard a gunshot, and saw the police officer
fall to the ground as the man ran away from the scene. On cross-examination, Henderson
acknowledged that she later accompanied defense counsel to the crime scene and described
to him what she had observed on the night of the murder. Defense counsel made multiple
attempts to ask Henderson if she thought that the shooting was an accident:

[DEFENSE COUNSEL]: Did it ever appear to you that this was anything
other than some type of struggle that was - - resulted in an unintentional type
of result?


 [PROSECUTOR]: Judge, I'm going to object to that. That invades the
province of the jury.


 THE COURT: That's sustained.


 [DEFENSE COUNSEL]: Your Honor, I just refer to Rules of Evidence
701 and 704.


 THE COURT: No, that's - - I'm going to sustain the objection.


 * * *


[DEFENSE COUNSEL]: And didn't you speak to me when we were out there
describing how this happened that it appeared to you to be accidental?


 [PROSECUTOR]: Your Honor, I'm going to object. That is - - again,
it invades the province of the jury.


 THE COURT: Sustained.


 * * *


[DEFENSE COUNSEL]: Did you not describe it that way to me?


 [PROSECUTOR]: And again, I'm going to object.


 THE COURT: That's sustained.


Defense counsel later made a bill of exception presenting the testimony he would have
elicited from Henderson:

[DEFENSE COUNSEL]: Ms. Henderson, do you recall stating a previous
time that - - that based on the facts and what you had seen out there that night
that you - - it was your opinion and your inference that it could have been an
accident?


[HENDERSON]: To you, yes.


[DEFENSE COUNSEL]: Yes, you said that to me.


[HENDERSON]: Yes.


[DEFENSE COUNSEL]: Do you remember saying that back on August 28th
of - - of this year, approximately August 28th, you don't remember the exact
date?


[HENDERSON]: Yes.


 Garza argues on appeal that Henderson's testimony was admissible lay opinion
testimony. (8) Even if we were to assume that the trial court abused its discretion by excluding
Henderson's testimony, we conclude that any error was harmless. On the second day of
Henderson's testimony, defense counsel asked her about the conversation she had with the
prosecutors following the conclusion of her testimony the previous day:

[DEFENSE COUNSEL]: When you talked to the prosecutors, you didn't talk
to them yesterday about anything that you had said to me on August 28th.


[HENDERSON]: Oh, yes, I did.


[DEFENSE COUNSEL]: You did.


[HENDERSON]: Yes.


[DEFENSE COUNSEL]: Well, what did you tell them?


[HENDERSON]: That I was concerned about the fact that you had implied
that it might be an accident.


[DEFENSE COUNSEL]: Mm-hmm. And you didn't say anything like that?


 [PROSECUTOR]: Your Honor, I'm going to object.


 THE COURT: Overruled.


 [HENDERSON]: Yes.


[DEFENSE COUNSEL]: You did, didn't you?


[HENDERSON]: Yes.


Given that defense counsel ultimately elicited the desired testimony, the trial court's ruling,
if erroneous, did not affect Garza's substantial rights. (9) Point of error two is overruled.

 In point of error three, Garza contends that the trial court violated Rule 403 in
admitting State's Exhibits 93, 94, 99, 101, 102, and 103, photographs taken during Riojas's
autopsy. Rule 403 requires that a photograph have some probative value and that its
probative value not be substantially outweighed by its unfairly prejudicial nature. (10) A court
may consider many factors in determining whether the probative value of photographs is
substantially outweighed by the danger of unfair prejudice. These factors include: the
number of exhibits offered, their gruesomeness, their detail, their size, whether they are in
color or black-and-white, whether they are close-up, whether the body depicted is clothed or
naked, the availability of other means of proof, and other circumstances unique to the
individual case. (11) The admissibility of photographs over an objection is within the sound
discretion of the trial judge. (12) Autopsy photographs are generally admissible unless they
depict mutilation of the victim caused by the autopsy itself. (13)

 Garza argues that the large, color photographs at issue are gruesome and
inflammatory. State's Exhibit 93 was taken when Riojas's body arrived at the medical
examiner's office. It is a photograph of Riojas's head and shoulders in which the gunshot
wound to his forehead is visible. It also depicts an endotracheal tube and oral gastric tube
in Riojas's mouth. Garza argues that the photograph served to "inflame the minds of the jury
through the depiction of the tubes and blood on the head of the body from resuscitation
procedures." The fact that the photograph depicts tubes still in place after doctors attempted
to resuscitate Riojas does not necessarily render it inadmissible. (14) While some blood is
visible in the photograph, it is no more gruesome than would be expected after such an
offense. (15)

 State's Exhibit 94 depicts abrasions on the fingers of Riojas's right hand and bruising
on his right thigh. State's Exhibit 99 depicts an abrasion on his left thigh. The medical
examiner testified that Riojas could have sustained the abrasions during the struggle in the
parking lot prior to the shooting. A stitched incision is visible on Riojas's right thigh in
State's Exhibit 94. The medical examiner explained that Riojas's body was "harvested" for
skin, bone, and organ donations prior to the autopsy, and that the incision depicted in State's
Exhibit 94 was "a fresh incision that's been sutured and that is due to bone harvesting after
death." State's Exhibit 99 also shows sutured incisions, evidence of skin harvesting, and a
catheter tube. Garza argues that the photographs "depicting the mutilated body after the
harvesting and autopsy" served to inflame the minds of the jury. 

 We have previously held admissible autopsy photographs which depict suturing in
addition to the injuries caused by the defendant. (16) With regard to State's Exhibits 94 and 99,
neither of the photographs is particularly gruesome or disturbing. The jury was aware when 
it viewed the photographs that Riojas's body was harvested for organ, bone, and skin
donations prior to the autopsy. This alteration of Riojas's body did not enhance its
gruesomeness to Garza's detriment. (17)

 State's Exhibits 101 and 102 depict the perforation and fracturing of Riojas's skull
caused by the gunshot wound to his head. These photographs were taken after the medical
examiner had dissected and moved Riojas's scalp to expose his entire skull area. State's
Exhibit 103 is a picture of Riojas's brain which depicts the bleeding and bruising that were
caused by the bullet. This photograph was taken after the medical examiner removed the top
portion of Riojas's skull to provide a view of his brain. 

 The medical examiner testified that Riojas sustained a gunshot wound to his forehead,
and that a portion of the bullet entered his skull and caused a number of lacerations, bruises,
and hemorrhages to his brain. The medical examiner explained that he dissected Riojas's
scalp and removed part of his skull in order to examine the inside of his head and view the
injuries to his brain. If Riojas's scalp had not been pulled back and the top of his skull had
not been removed, the jury would not have been able to see the full extent of his fatal
injuries. (18) Although State's Exhibits 101, 102, and 103 are close-up, graphic, and gruesome,
they are not unfairly prejudicial because they are highly probative and demonstrative of the
manner of Riojas's death and the extent of his injuries. 

 Garza further argues that the autopsy photographs at issue were cumulative. However,
there were only eleven autopsy photographs admitted into evidence, and no two are exactly
the same. They depict the multiple injuries sustained by Riojas, both internal and external,
from varying angles and viewpoints. The probative value of the photographs is not
substantially outweighed by the danger of unfair prejudice or the needless presentation of
cumulative evidence. (19) Point of error three is overruled.

 In point of error four, Garza argues that the trial court erroneously excluded evidence
of Riojas's violent character. He contends that evidence of prior specific acts of violence
committed against other individuals by Riojas was crucial to his own claim of self-defense
at trial. (20) We will review the trial court's decision to exclude evidence under an abuse-of-discretion standard and will not reverse the trial court's ruling unless that ruling falls outside
the zone of reasonable disagreement. (21)

 The State made a motion in limine requesting that the defense approach the bench
before mentioning events or occasions where Riojas was "alleged to have used excessive
force in encounters with and/or apprehensions of individuals" other than Garza. Defense
counsel argued that the evidence was admissible to show that Riojas was the first aggressor
in the instant case. The trial court initially ruled that the evidence was admissible. However,
when the State later re-urged its motion, the trial court ruled that the evidence was
inadmissible, reasoning that evidence of Riojas's prior acts of violence was being offered
"only to show his violent propensity to others." Defense counsel then made a bill of
exception presenting evidence of nine prior instances in which Riojas was allegedly violent
towards other individuals.

 When a defendant in a homicide case raises the issue of self-defense, he may
introduce evidence of the deceased's violent character. (22) Specific acts of violence are
admissible to demonstrate that the deceased was the first aggressor, but only to the extent that
they are relevant apart from showing character conformity. (23) When such evidence is offered
to show that the deceased was the first aggressor, the defendant need not have knowledge of
the specific violent acts at the time of the homicide. (24) "The proper predicate for the specific
violent prior act by the deceased is some act of aggression that tends to raise the issue of
self-defense, which the violent act may then help clarify." (25) The key is that the proffered
evidence explains the deceased's conduct. (26) "As long as the proffered violent acts explain
the outward aggressive conduct of the deceased at the time of the killing, and in a manner
other than demonstrating character conformity only, prior specific acts of violence may be
admitted even though those acts were not directed against the defendant." (27)

 Garza gave police two statements relating his version of events. Garza told police that
Riojas pulled into the parking lot of the apartment complex, exited his police vehicle, and
walked up to him and asked him his name. Garza gave him a false name because he did not
want Riojas to arrest him for outstanding warrants. When Riojas told Garza to place his
hands on the car, Garza ran toward the back of the apartment complex to avoid being
arrested. Riojas ran after him and yelled for him to stop. In his first statement, Garza said
that he "got the cop in a hug" and "wrapped both [his] arms around him and started wrestling
with him." During the struggle, Riojas took his gun out of his holster, Garza grabbed it, the
gun discharged, and Riojas was shot. 

 In his second statement, Garza said that he eventually became tired and stopped
running from Riojas. He stated, "The cop was right on my ass and I turned around real quick
and I threw my hands out and the cop was right there and he grabbed my right hand and he
punched me in the mouth." He then "grabbed the cop in a hug" and they started wrestling
and fell to the ground. Riojas pulled out his gun and Garza was able to get it away from him. 
Again, Garza stated that Riojas was shot as the two men struggled for the gun.

 Thomas Matjeka, the detective who took Garza's statements, testified that Garza
physically demonstrated to him what he meant when he stopped, turned, and "threw [his]
hands out" to Riojas. Matjeka explained: "His palms were facing out towards Officer
Riojas. We call this a bladed stance. It's a posture that indicates to us that an attack was
coming."

 Neither of the two witnesses to the incident saw Riojas hit Garza. Nathan Henges
witnessed the beginning of the struggle from his girlfriend's balcony. Henges testified that
"the two men engage[d] each other and [began] to basically wrestle on the ground, basically
[tried] to take each other down to the ground." Henges did not see either of them raise his
hands or hit the other. Erica Henderson, who came upon the scene after Riojas and Garza
were already engaged in a struggle, did not witness them exchange any blows. She testified
that they were on their knees, and that Garza had a gun and Riojas was trying to get him into
a head lock. She further testified that Riojas's arms "were nowhere near the gun" when it
went off.

 The proffered evidence was not necessary to explain or clarify Riojas's conduct at the
time of the murder. Riojas's actions were in direct response to Garza's attempt to resist
arrest. The prior specific acts of violence that Riojas allegedly committed against other
individuals had no relevance apart from character conformity. Although the trial court
charged the jury on self-defense, that is not dispositive. The issue is whether the evidence
raised self-defense. Here, the evidence did not. The trial court was within the zone of
reasonable disagreement in excluding Garza's proffered evidence. Point of error four is
overruled. 

 In point of error five, Garza asserts that the trial court erred in refusing to instruct the
jury on the lesser-included offense of manslaughter. We use a two-pronged test to determine
whether a defendant is entitled to an instruction on a lesser-included offense. (28) The first step
in our analysis is to determine if the lesser offense is included within the proof necessary to
establish the offense charged. (29) Garza has satisfied the first prong of the test because we
have previously held that manslaughter is a lesser-included offense of capital murder. (30)

 The second step requires an evaluation of the evidence to determine whether there is
some evidence that would permit a jury rationally to find that the defendant is guilty only of
the lesser offense. (31) In other words, there must be some evidence from which a jury could
rationally acquit the defendant of the greater offense while convicting him of the
lesser-included offense. (32) The evidence must establish the lesser-included offense as a valid,
rational alternative to the charged offense. (33)

 Garza asserts that in his written statements to police he "clearly stated that he did not
intentionally shoot the complainant but that the gun discharged during the struggle." Prior
to making his written statements, Garza told Detective Matjeka that the shooting of Riojas
was an accident. He also told Jesusita Perez, who witnessed his initial statement, that it was
an accident. However, Garza was inconsistent in both of his written statements about
whether the gun "went off" during the struggle, or whether he "pulled the trigger." In his
first written statement, dated February 4, 2001, Garza initially said:

When the cop tried to get his gun out he was behind me still grabbing onto me
with one hand pushing me down into the ground and he was reaching for his
gun with the other hand. I was still trying to get away because I didn't want
to go to jail. I twisted around while I was under the cop and I was able to face
him and I saw he had just got his gun out of the holster. I grabbed the cop's
hand that was holding the gun and my other hand was holding the cop off me. 
He was a big dude. I grabbed the hand that he had the gun in and I was able
to twist the gun away from me and it was pointed upwards where it was facing
the cop and then the gun went off. I saw blood all over my hand and the cop
just fell. I ran.


But Garza later said in the same statement:

It did happen a little different than what I just said. What really happened was
we were on our knees by the curb. The officer was behind me and I was still
trying to get away and the officer was still trying to get a hold of me. I seen
the officer was taking the gun out of his holster and I twisted and reached and
grabbed his gun with my left hand. I got the gun from the officer and I
reached around over my right shoulder and I was trying to crawl away and I
pointed the gun over my right shoulder and I pulled the trigger. The gun had
a hair trigger on it and it surprised me when it . . . went off so quick. I only
fired one time. The cop went down and he landed on my right side and I got
up and took off running.


 Garza again vacillated between saying that the gun "went off" and that he "pulled the
trigger" in his second written statement, dated February 6, 2001: 

. . . I was able to pull the gun out of the cop's hand. I was able to crawl away
a few feet and I got up on my knees. The cop came up behind me and he
reached around and he grabbed my arm that had the gun in it. I still had the
gun in my left hand and the cop was still trying to get the gun. I wanted to get
away and the cop was holding me to where I had to reach over and the gun was
pointing his way over my right shoulder and the gun went off as the cop was
grabbing it. When I pulled the trigger the cop's body was against mine. When
the gun went off I couldn't hear nothing . . . After I shot the cop fell right
down. I only fired one shot. I didn't fall but he did. I got up and I never even
looked at the cop. I ran back into the apartment to where I was at before.


 The testimony of the firearms examiner, Edward William Love, Jr., cast doubt on
Garza's statements that the gun had a "hair trigger" and "went off" during his struggle with
Riojas. Love testified that Riojas's Glock pistol had three safety mechanisms, including a
"trigger safety," a "drop safety," and a "firing pin block," and that all three safeties were
working correctly when he test fired the gun. Love further testified that Riojas's gun had
been modified to require more than the average amount of pressure than would normally be
required to fire such a weapon. He stated that it normally takes five to five and one-half
pounds of pressure on the trigger pull to discharge a Glock pistol, but Riojas's Glock pistol
required eight to eight and one-quarter pounds of pressure to discharge.

 Witness Erica Henderson also testified that she saw Garza pull the trigger. She
testified that Riojas and Garza were struggling with one another on their knees, that Garza
had a gun in his left hand, and that Riojas was attempting to get Garza into a head lock. She
saw Riojas reaching for the gun and Garza moving his hands about to keep the gun away
from him. She saw Garza raise the gun over his right shoulder, duck his head away from the
gun, and pull the trigger. Henderson testified that Riojas's arms "were nowhere near the
gun" when Garza raised the gun and ducked his head. Henderson heard a gunshot and saw
Riojas fall to the ground. Garza then stood up, took a brief look, put the gun in his pants, and
ran away. Other evidence showed that Garza watched television and drank beer with some
friends following the shooting, and that he sold the gun to his sister's boyfriend either that
night or the following day.

 Garza's written statements do not amount to evidence upon which a jury could
rationally find that his actions toward Riojas were only reckless and were not intentional or
knowing. At most, Garza's statements raise the issue of voluntary conduct, and the jury was
instructed on that issue. Garza has failed to satisfy the second prong of the test; thus, the trial
court did not err in refusing to instruct the jury on the lesser-included offense of
manslaughter. Point of error five is overruled.

 In point of error six, Garza argues that Article 37.071 is unconstitutionally vague
because it fails to define the terms "personal moral capability" and "sufficient mitigating
circumstances." We have previously decided these and similar claims adversely to Garza. (34) 
Point of error six is overruled.

 We affirm the judgment of the trial court.

DATE DELIVERED: February 16, 2005


DO NOT PUBLISH







 
1. Tex. Penal Code § 19.03(a).
2. Unless otherwise indicated, all references to Articles refer to the Texas Code of
Criminal Procedure.
3. Article 37.071, § 2(g). 
4. Article 37.071, § 2(h). 
5. King v. State, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000); Green v. State, 840
S.W.2d 394, 408 (Tex. Crim. App. 1992), cert. denied, 507 U.S. 1020 (1993).
6. See Article 26.04(j)(2). 
7. Acts 2001, 77
th Leg., ch. 906, § 6, eff. Jan. 1, 2002.
8. See TEX. R. EVID. 701, 704. 
9. T
EX. R. APP. P. 44.2(b).
10. Tex. R. Evid. 403; Long v. State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991),
cert. denied, 505 U.S. 1224 (1992). 
11. Long, 823 S.W.2d at 272; Santellan v. State, 939 S.W.2d 155, 172 (Tex. Crim.
App. 1997). 
12. Sonnier v. State, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). 
13. Santellan, 939 S.W.2d at 172.
14. See McFarland v. State, 845 S.W.2d 824, 841 (Tex. Crim. App. 1992)(holding trial
court did not abuse its discretion in admitting photograph where various medical tubes and
equipment were visible), cert. denied, 508 U.S. 963 (1993); see also Green v. State, 840
S.W.2d 394, 410-411 (Tex. Crim. App. 1992)(holding admissible a close-up photograph of
victim's head and shoulders where tubes and other medical equipment were visible), cert.
denied, 507 U.S. 1020 (1993). 
15. See McFarland, 845 S.W.2d at 841. 
16. Newbury v. State, 135 S.W.3d 22, 41-44 (Tex. Crim. App.), cert. denied, 125 S. Ct.
496 (2004); Hayes v. State, 85 S.W.3d 809, 815-16 (Tex. Crim. App. 2002).
17. See Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992), cert. denied,
507 U.S. 975 (1993). 
18. See Hayes, 85 S.W.3d at 816. 
19. Tex. R. Evid. 403. 
20. See TEX. PENAL CODE § 9.31(c).
21. Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996), cert. denied, 520
U.S. 1200 (1997). 
22. TEX. R. EVID. 404(a)(2); Torres v. State, 117 S.W.3d 891, 894 (Tex. Crim. App.
2003). 
23. Torres, 117 S.W.3d at 894.
24. Id. at 894-895; Tate v. State, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998).
25. Torres, 117 S.W.3d at 895 (emphasis in original). 
26. Torres v. State, 71 S.W.3d 758, 762 (Tex. Crim. App. 2002).
27. Id.
28. Rousseau v. State, 855 S.W.2d 666, 673 (Tex. Crim. App.), cert. denied, 510 U.S.
919 (1993). 
29. Id. 
30. Mathis v. State, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002); Cardenas v. State,
30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000). 
31. Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998); Rousseau, 855 S.W.2d
at 672. 
32. Moore, 969 S.W.2d at 8. 
33. Wesbrook v. State, 29 S.W.3d 103, 113-14 (Tex. Crim. App. 2000), cert. denied,
532 U.S. 944 (2001).
34. Blue v. State, 125 S.W.3d 491, 505 (Tex. Crim. App. 2003), cert. denied, 125 S.
Ct. 297 (2004); Ladd v. State, 3 S.W.3d 547, 572-73 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1070 (2000); Raby v. State, 970 S.W.2d 1, 8 (Tex. Crim. App.), cert. denied, 525
U.S. 1003 (1998).